**Laura ZUBULAKE, Plaintiff,**

v.

**UBS WARBURG LLC, UBS Warburg, and UBS AG, Defendants.**

**No. 02 Civ. 1243(SAS).**

United States District Court, S.D. New York.

Oct. 22, 2003.

advertise.

214

James A. Batson, Liddle & Robinson, LLP, New York City, for Plaintiff.

Kevin B. Leblang, Norman C. Simon, Kramer Levin Naftalis & Frankel LLP, New York City, for Defendants.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

"Documents create a paper reality we call proof."[1] The absence of such documentary proof may stymie the search for the truth. If documents are lost or destroyed when they should have been preserved because a litigation was threatened or pending, a party may be prejudiced. The questions presented here are how to determine an appropriate penalty for the party that caused the loss and—the flip side—how to determine an appropriate remedy for the party injured by the loss.

Finding a suitable sanction for the destruction of evidence in civil cases has never been easy. Electronic evidence only complicates matters. As documents are increasingly maintained electronically, it has become easier to delete or tamper with evidence (both intentionally and inadvertently) and more difficult for litigants to craft policies that ensure all relevant documents are preserved.[2] This opinion addresses both the scope of a litigant's duty to preserve electronic documents and the consequences of a failure to preserve documents that fall within the scope of that duty.

### I. BACKGROUND

This is the fourth opinion resolving discovery disputes in this case. Familiarity with

---

**1.** Mason Cooley, *City Aphorisms, Sixth Selection* (1989).

**2.** *See* Adam I. Cohen & David J. Lender, *Electronic Discovery: Law and Practice* § 3.01 (Aspen Law & Business, publication forthcoming 2003)

("Unlike paper documents, electronic documents can be updated or changed without leaving an easily recognizable trace. Therefore, unique questions may arise as to the scope of a party's duty to preserve evidence in electronic form.").

the prior opinions is presumed,[3] and only background information relevant to the instant dispute is described here. In brief, Laura Zubulake, an equities trader who earned approximately $650,000 a year with UBS,[4] is suing UBS for gender discrimination, failure to promote, and retaliation under federal, state, and city law. She has repeatedly maintained that the evidence she needs to prove her case exists in e-mail correspondence sent among various UBS employees and stored only on UBS's computer systems.

On July 24, 2003, I ordered the parties to share the cost of restoring certain UBS backup tapes that contained e-mails relevant to Zubulake's claims.[5] In the restoration effort, the parties discovered that certain backup tapes are missing. In particular:

| Individual/Server | Missing Monthly Backup Tapes |
| --- | --- |
| Matthew Chapin (Zubulake's immediate supervisor) | April 2001 |
| Jeremy Hardisty (Chapin's supervisor) | June 2001 |
| Andrew Clarke and Vinay Datta (Zubulake's coworkers) | April 2001 |
| Rose Tong (human resources) | Part of June 2001, July 2001, August 2001, and October 2001 |

(UBS has located certain *weekly* backup tapes to fill some of the gaps created by the lost monthly tapes).

In addition, certain isolated e-mails—created after UBS supposedly began retaining all relevant e-mails—were deleted from UBS's system, although they appear to have been saved on the backup tapes. As I explained in *Zubulake III*, "certain e-mails sent after the initial EEOC charge—and particularly relevant to Zubulake's retaliation claim—were apparently not saved at all. For example, [an] e-mail from Chapin to Joy Kim [another of Zubulake's coworkers] instructing her on how to file a complaint against Zubulake was not saved, and it bears the subject line 'UBS client attorney priviledge [sic] only,' although no attorney is copied on the e-mail. This potentially useful e-mail was deleted and resided only on UBS's backup tapes." [6]

Zubulake filed her EEOC charge on August 16, 2001; the instant action was filed on February 14, 2002. In August 2001, in an oral directive, UBS ordered its employees to retain all relevant documents.[7] In August 2002, after Zubulake specifically requested e-mail stored on backup tapes, UBS's outside counsel orally instructed UBS's information technology personnel to stop recycling backup tapes.[8]

Zubulake now seeks sanctions against UBS for its failure to preserve the missing backup tapes and deleted e-mails. In particular, Zubulake seeks the following relief: (a) an order requiring UBS to pay in full the costs of restoring the remainder of the monthly backup tapes; (b) an adverse inference instruction against UBS with respect to the backup tapes that are missing; and (c) an order directing UBS to bear the costs of redeposing certain individuals, such as Chapin,

---

**3.** *See Zubulake v. UBS Warburg, LLC,* 217 F.R.D. 309 (S.D.N.Y.2003) (*"Zubulake I"*) (addressing the legal standard for determining the cost allocation for producing e-mails contained on backup tapes); *Zubulake v. UBS Warburg, LLC,* No. 02 Civ. 1243, 2003 WL 21087136 (S.D.N.Y. May 13, 2003) (*"Zubulake II"*) (addressing Zubulake's reporting obligations); *Zubulake v. UBS Warburg LLC,* 216 F.R.D. 280 (S.D.N.Y.2003) (*"Zubulake III"*) (allocating backup tape restoration costs between Zubulake and UBS).

**4.** *See* 6/20/03 Letter from James A. Batson, Zubulake's counsel, to the Court.

**5.** *Zubulake III,* 216 F.R.D. 280.

**6.** *Zubulake III,* 216 F.R.D. at 287.

**7.** *See* 3/26/03 Oral Argument Transcript at 40 (Statement of Kevin Leblang, counsel to UBS) ("As of August when Ms. Zubulake filed a charge, everyone was told nothing gets deleted and we searched everyone's computer, everyone's hard files, the human resources files and the legal files.").

**8.** *See* 9/26/03 Oral Argument Transcript ("9/26/03 Tr.") at 18 (Statement of Norman C. Simon, counsel to UBS); *see also* 10/14/03 Letter from Norman Simon to the Court ("10/14/03 Ltr.") at 2.

concerning the issues raised in newly produced e-mails.

## II. LEGAL STANDARD

 Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."[9] The spoliation of evidence germane "to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction."[10] However, "[t]he determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge, and is assessed on a case-by-case basis."[11] The authority to sanction litigants for spoliation arises jointly under the Federal Rules of Civil Procedure and the court's own inherent powers.[12]

## III. DISCUSSION

It goes without saying that a party can only be sanctioned for destroying evidence if it had a duty to preserve it. If UBS had no such duty, then UBS cannot be faulted. I begin, then, by discussing the extent of a party's duty to preserve evidence.

### A. Duty to Preserve

 "The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation."[13] Identifying the boundaries of the duty to preserve involves two related inquiries: *when* does the duty to preserve attach, and *what* evidence must be preserved?

### 1. The Trigger Date

In this case, the duty to preserve evidence arose, at the latest, on August 16, 2001, when Zubulake filed her EEOC charge.[14] At that time, UBS's in-house attorneys cautioned employees to retain all documents, including e-mails and backup tapes, that could potentially be relevant to the litigation.[15] In meetings with Chapin, Clarke, Kim, Hardisty, John Holland (Chapin's supervisor), and Dominic Vail (Zubulake's former supervisor) held on August 29–31, 2001, UBS's outside counsel reiterated the need to preserve documents.[16]

But the duty to preserve may have arisen even before the EEOC complaint was filed. Zubulake argues that UBS "should have known that the evidence [was] relevant to future litigation,"[17] as early as April 2001, and thus had a duty to preserve it. She offers two pieces of evidence in support of this argument. *First,* certain UBS employees titled e-mails pertaining to Zubulake "UBS Attorney Client Privilege" starting in April 2001, notwithstanding the fact that no attorney was copied on the e-mail and the

---

9. *West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2d Cir.1999).

10. *Kronisch v. United States,* 150 F.3d 112, 126 (2d Cir.1998).

11. *Fujitsu Ltd. v. Federal Express Corp.,* 247 F.3d 423, 436 (2d Cir.2001).

12. *See Turner v. Hudson Transit Lines, Inc.,* 142 F.R.D. 68, 72 (S.D.N.Y.1991) (Francis, M.J.) (citing Fed.R.Civ.P. 37). *See also Shepherd v. American Broadcasting Companies,* 62 F.3d 1469, 1474 (D.C.Cir.1995) ("When rules alone do not provide courts with sufficient authority to protect their integrity and prevent abuses of the judicial process, the inherent power fills the gap."); *id.* at 1475 (holding that sanctions under the court's inherent power can "include ... drawing adverse evidentiary inferences"). *See generally* Cohen & Lender, *supra* note 2, §§ 3.02[B][1]-[2].

13. *Fujitsu,* 247 F.3d at 436 (citing *Kronisch,* 150 F.3d at 126). *See also Silvestri v. General Motors*

*Corp.,* 271 F.3d 583, 591 (4th Cir.2001) ("The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation.") (citing *Kronisch,* 150 F.3d at 126).

14. *See* 9/26/03 Tr. at 16 (statement of Norman C. Simon agreeing that the duty to preserve attached no later than August 2001).

15. *See* 10/14/03 Ltr. and attached exhibits (reflecting correspondence from UBS's in-house counsel reiterating, in writing, the August 2001 oral directive to UBS employees to preserve documents).

16. *See id.* at 1 n. 1.

17. *Fujitsu,* 247 F.3d at 436.

substance of the e-mail was not legal in nature. *Second,* Chapin admitted in his deposition that he feared litigation from as early as April 2001:

Q: Did you think that Ms. Zubulake was going to sue UBS when you received these documents?

A: What dates are we talking about?

Q: Late April 2001.

A: Certainly it was something that was in the back of my head.[18]

■ Merely because one or two employees contemplate the possibility that a fellow employee might sue does not generally impose a firm-wide duty to preserve. But in this case, it appears that almost everyone associated with Zubulake recognized the possibility that she might sue. For example, an e-mail authored by Zubulake's co-worker Vinnay Datta, concerning Zubulake and labeled "UBS attorney client priviladge [sic]," was distributed to Chapin (Zubulake's supervisor), Holland and Leland Tomblick (Chapin's supervisor), Vail (Zubulake's former supervisor), and Andrew Clarke (Zubulake's co-worker) in late April 2001.[19] That e-mail, replying to one from Hardisty, essentially called for Zubulake's termination: "Our biggest strength as a firm and as a desk is our ability to share information and relationships. Any person who threatens this in any way should be firmly dealt with.... [B]elieve me that a lot of other [similar] instances have occurred earlier." [20]

Thus, the relevant people at UBS anticipated litigation in April 2001. The duty to preserve attached at the time that litigation was reasonably anticipated.

## 2. Scope

■ The next question is: What is the scope of the duty to preserve? Must a corporation, upon recognizing the threat of litigation, preserve every shred of paper, every e-mail or electronic document, and every backup tape? The answer is clearly, "no". Such a rule would cripple large corporations, like UBS, that are almost always involved in litigation.[21] As a general rule, then, a party need not preserve all backup tapes even when it reasonably anticipates litigation.[22]

■ At the same time, anyone who anticipates being a party or is a party to a lawsuit must not destroy unique, relevant evidence that might be useful to an adversary. "While a litigant is under no duty to keep or retain every document in its possession ... it is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery and/or is the subject of a pending discovery request." [23]

### i. Whose Documents Must Be Retained?

The broad contours of the duty to preserve are relatively clear. That duty should certainly extend to any documents or tangible things (as defined by Rule 34(a)) [24] made by

---

**18.** 2/12/03 Deposition of Matthew Chapin at 247:14–247:19, Ex. B. to the 9/15/03 Letter from James Batson to the Court ("Batson Ltr.").

**19.** *See* 4/27/01 e-mail, Ex. A to Batson Ltr.

**20.** *Id.*

**21.** *Cf. Concord Boat Corp. v. Brunswick Corp.,* No. LR–C–95–781, 1997 WL 33352759, at *4 (E.D.Ark. Aug. 29, 1997) ("to hold that a corporation is under a duty to preserve all e-mail potentially relevant to any future litigation would be tantamount to holding that the corporation must preserve all e-mail.... Such a proposition is not justified.").

**22.** *See, e.g., The Sedona Principles: Best Practices, Recommendations & Principles for Addressing Electronic Document Discovery* cmt 6.h (Se-

dona Conference Working Group Series 2003) ("Absent specific circumstances, preservation obligations should not extend to disaster recovery backup tapes....").

**23.** *Turner,* 142 F.R.D. at 72 (quoting *William T. Thompson Co. v. General Nutrition Corp.,* 593 F.Supp. 1443, 1455 (C.D.Cal.1984)).

**24.** *See* Fed.R.Civ.P. 34(a) (defining the term "document" to "includ[e] writings, drawings, graphs, charts, photographs, phonorecords, and other data compilations from which information can be obtained, translated, if necessary, by the respondent through detection devices into reasonably usable form"); *see also Zubulake I,* 217 F.R.D. at 316–17 (holding that the term "document," within the meaning of Rule 34(a), includes e-mails contained on backup tapes).

individuals "likely to have discoverable information that the disclosing party may use to support its claims or defenses."[25] The duty also includes documents prepared *for* those individuals, to the extent those documents can be readily identified (*e.g.*, from the "to" field in e-mails). The duty also extends to information that is relevant to the claims or defenses of *any* party, or which is "relevant to the subject matter involved in the action."[26] Thus, the duty to preserve extends to those employees likely to have relevant information—the "key players" in the case. In this case, all of the individuals whose backup tapes were lost (Chapin, Hardisty, Tong, Datta and Clarke) fall into this category.[27]

### ii. What Must Be Retained?

A party or anticipated party must retain all relevant documents (but not multiple identical copies) in existence at the time the duty to preserve attaches, and any relevant documents created thereafter. In recognition of the fact that there are many ways to manage electronic data, litigants are free to choose how this task is accomplished. For example, a litigant could choose to retain all then-existing backup tapes for the relevant personnel (if such tapes store data by individual or the contents can be identified in good faith and through reasonable effort), and to catalog any later-created documents in a separate electronic file. That, along with a mirror-image of the computer system taken at the time the duty to preserve attaches (to preserve documents in the state they existed at that time), creates a complete set of relevant documents. Presumably there are a multitude of other ways to achieve the same result.

### iii. Summary of Preservation Obligations

■ The scope of a party's preservation obligation can be described as follows: Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a "litigation hold" to ensure the preservation of relevant documents. As a general rule, that litigation hold does not apply to inaccessible backup tapes (*e.g.*, those typically maintained solely for the purpose of disaster recovery), which may continue to be recycled on the schedule set forth in the company's policy. On the other hand, if backup tapes are accessible (*i.e.*, actively used for information retrieval), then such tapes *would* likely be subject to the litigation hold.

■ However, it does make sense to create one exception to this general rule. If a company can identify where particular employee documents are stored on backup tapes, then the tapes storing the documents of "key players" to the existing or threatened litigation should be preserved if the information contained on those tapes is not otherwise available. This exception applies to *all* backup tapes.

### iv. What Happened at UBS After August 2001?

By its attorney's directive in August 2002, UBS endeavored to preserve all backup tapes that existed in August 2001 (when Zubulake filed her EEOC charge) that captured data for employees identified by Zubulake in her document request, and all such monthly backup tapes generated thereafter. These backup tapes existed in August 2002, because of UBS's document retention policy, which required retention for three years.[28] In August 2001, UBS employees were instructed to maintain *active* electronic documents pertaining to Zubulake in separate files.[29] Had these directives been followed, UBS would have met its preservation obligations by preserving one copy of all relevant documents

---

25. Fed.R.Civ.P. 26(a)(1)(A).

26. Fed.R.Civ.P. 26(b)(1).

27. *See* 9/26/03 Tr. at 17 (Statement of Norman C. Simon agreeing that the duty to preserve applied to the documents' of Chapin, Hardisty, Tong, Datta and Clarke).

28. *See Zubulake I*, 217 F.R.D. at 314 ("Nightly backup tapes were kept for twenty working days, weekly tapes for one year, and monthly tapes for three years.").

29. *See Zubulake III*, 216 F.R.D. at 287.

that existed at, or were created after, the time when the duty to preserve attached.

In fact, UBS employees did not comply with these directives. Three backup tapes containing the e-mail files of Chapin, Hardisty, Clarke and Datta created after April 2001 were lost, despite the August 2002 directive to maintain those tapes. According to the UBS document retention policy, these three monthly backup tapes from April and June 2001 should have been retained for three years.[30]

The two remaining lost backup tapes were for the time period *after* Zubulake filed her EEOC complaint (Rose Tong's tapes for August and October 2001). UBS has offered *no* explanation for why these tapes are missing. UBS initially argued that Tong is a Hong Kong based UBS employee and thus her backup tapes "are not subject to any internal retention policy."[31] However, UBS subsequently informed the Court that there *was* a document retention policy in place in Hong Kong starting in June 2001, although it only required that backup tapes be retained for one month.[32] It also instructed employees "not [to] delete any emails if they are aware that ... litigation is pending or likely, or during ... a discovery process."[33] In any event, it appears that UBS did not directly order the preservation of Tong's backup tapes until August 2002, when Zubulake made her discovery request.[34]

In sum, UBS had a duty to preserve the six-plus backup tapes (that is, six complete backup tapes and part of a seventh) at issue here.

## B. Remedies

As noted, Zubulake has requested three remedies for UBS's spoliation of evidence. I consider each remedy in turn.

### 1. Reconsideration of the Cost–Shifting Order

■ Zubulake's request that this Court re-consider its July 24, 2003, Order in *Zubulake III* is inappropriate. At the time that motion was made, the Court was well aware that certain e-mails had not been retained and that certain backup tapes were missing.[35] Indeed, Zubulake urged that these missing backup tapes "be considered as a factor in why the costs should be shifted to defendants," in part because she would have chosen one of the lost tapes as part of the court-ordered sample restoration.[36] And these lost tapes and deleted e-mails did, in fact, inform my resolution of the cost-shifting motion. In *Zubulake III*, in my analysis of the marginal utility factors, I specifically noted that "there is some evidence that Chapin was concealing and deleting especially relevant e-mails."[37] There is therefore no need to reconsider that ruling in light of the instant motion; this evidence already played a role in the cost-shifting decision.

### 2. Adverse Inference

■ Zubulake next argues that UBS's spoliation warrants an adverse inference instruction. Zubulake asks that the jury in this case be instructed that it can infer from the fact that UBS destroyed certain evidence that the evidence, if available, would have been favorable to Zubulake and harmful to UBS. In practice, an adverse inference instruction often ends litigation—it is too difficult a hurdle for the spoliator to overcome. The *in terrorem* effect of an adverse inference is obvious. When a jury is instructed that it may "infer that the party who de-

---

**30.** *See supra* note 28. According to a chart prepared by UBS's attorneys and presented during oral arguments, the three backup tapes of U.S. personnel were in fact deleted between October 2001 and February 2002—after UBS staff were warned to retain documents, but before they were told specifically to preserve backup tapes.

**31.** 9/17/03 Letter from Kevin Leblang to the Court ("Leblang Ltr.").

**32.** *See* 10/14/03 Ltr. at 2–3; *see also* UBS Asia policy for "Retention of Back-up Tapes of Email

Servers," ("UBS Asia Policy") Ex. F to 10/14/03 Ltr.

**33.** UBS Asia Policy at 2.

**34.** *See* 9/26/03 Tr. at 31, 35–36.

**35.** *See* 9/26/03 Tr. at 27.

**36.** 6/17/03 Oral Argument Transcript (Statement of James Batson).

**37.** 216 F.R.D. at 287.

stroyed potentially relevant evidence did so 'out of a realization that the [evidence was] unfavorable,' "[38] the party suffering this instruction will be hard-pressed to prevail on the merits. Accordingly, the adverse inference instruction is an extreme sanction and should not be given lightly.[39]

 A party seeking an adverse inference instruction (or other sanctions) based on the spoliation of evidence must establish the following three elements: (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a "culpable state of mind" and (3) that the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.[40] In this circuit, a "culpable state of mind" for purposes of a spoliation inference includes ordinary negligence.[41] When evidence is destroyed in bad faith (*i.e.*, intentionally or willfully), that fact alone is sufficient to demonstrate relevance.[42] By contrast, when the destruction is negligent, relevance must be proven by the party seeking the sanctions.[43]

### a. Duty to Preserve

 For the reasons already discussed, UBS had—and breached—a duty to preserve

the backup tapes at issue. Zubulake has thus established the first element.

### b. Culpable State of Mind

Zubulake argues that UBS's spoliation was "intentional—or, at a minimum, grossly negligent."[44] Yet, of dozens of relevant backup tapes, only six and part of a seventh are missing. Indeed, UBS argues that the tapes were "inadvertently recycled well before plaintiff requested them and even before she filed her complaint [in February 2002]."[45]

But to accept UBS's argument would ignore the fact that, even though Zubulake had not yet requested the tapes or filed her complaint, UBS had a duty to preserve those tapes. Once the duty to preserve attaches, any destruction of documents is, at a minimum, negligent.[46] (Of course, this would not apply to destruction caused by events outside of the party's control, *e.g.*, a fire in UBS's offices).

Whether a company's duty to preserve extends to backup tapes has been a grey area. As a result, it is not terribly surprising that a company would think that it did *not* have a duty to preserve all of its backup tapes, even when it reasonably anticipated the onset of litigation. Thus, UBS's failure to preserve all potentially relevant backup tapes was merely negligent, as opposed to grossly negligent or reckless.[47]

---

**38.** *Linnen v. A.H. Robins Co.*, No. 97–2307, 1999 WL 462015, at *11 (Mass.Super. June 16, 1999) (alteration in original) (quoting *Blinzler v. Marriott International, Inc.*, 81 F.3d 1148, 1158 (1st Cir.1996)).

**39.** *See* Mary Kay Brown & Paul D. Weiner, *Digital Dangers: A Primer on Electronic Evidence in the Wake of Enron*, 74 Pa. B.A.Q. 1, 7 (2003) (listing "severe sanctions, such as adverse inference instructions" imposed by courts when "relevant electronic evidence was not preserved, or was intentionally destroyed"); *but see Mosel Vitelic Corp. v. Micron Technology, Inc.*, 162 F.Supp.2d 307, 315 (D.Del.2000) ("adverse inference instructions are one of the least severe sanctions which the court can impose").

**40.** *Byrnie v. Town of Cromwell*, 243 F.3d 93, 107–12 (2d Cir.2001).

**41.** *See Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 108 (2d Cir.2002).

**42.** *See id.* at 109.

**43.** *See id.*

**44.** *See* Batson Ltr. at 2.

**45.** Leblang Ltr. at 2.

**46.** *See* Black's Law Dictionary (6th ed.1991) (defining "negligence" as "that legal delinquency which results whenever a man fails to exhibit the care which he ought to exhibit, whether it be slight, ordinary, or great. It is characterized chiefly by inadvertence, thoughtlessness, inattention, and the like...."). *Cf. Keir v. Unumprovident Corp.*, No. 02 Civ. 8781, 2003 WL 21997747, at *13 (S.D.N.Y. Aug.22, 2003) (criticizing defendant for loss of e-mails even though loss occurred "through the fault of no one," because "[i]f UnumProvident had been as diligent as it should have been ... many fewer [backup] tapes would have been inadvertently overwritten.").

**47.** Litigants are now on notice, at least in this Court, that backup tapes that can be identified as storing information created by or for "key players" must be preserved.

UBS's destruction or loss of Tong's backup tapes, however, exceeds mere negligence. UBS failed to include these backup tapes in its preservation directive in this case, notwithstanding the fact that Tong was the human resources employee directly responsible for Zubulake and who engaged in continuous correspondence regarding the case. Moreover, the lost tapes covered the time period *after* Zubulake filed her EEOC charge, when UBS was *unquestionably* on notice of its duty to preserve. Indeed, Tong herself took part in much of the correspondence over Zubulake's charge of discrimination. Thus, UBS was grossly negligent, if not reckless, in not preserving those backup tapes.

Because UBS was negligent—and possibly reckless—Zubulake has satisfied her burden with respect to the second prong of the spoliation test.

### c. Relevance

 Finally, because UBS's spoliation was negligent and possibly reckless, but not willful, Zubulake must demonstrate that a reasonable trier of fact could find that the missing e-mails would support her claims.[48] In order to receive an adverse inference instruction, Zubulake must demonstrate not only that UBS destroyed relevant evidence as that term is ordinarily understood,[49] but also that the destroyed evidence would have been favorable to her.[50] "This corroboration requirement is even more necessary where the destruction was merely negligent, since in those cases it cannot be inferred from the conduct of the spoliator that the evidence would even have been harmful to him."[51]

This is equally true in cases of gross negligence or recklessness; only in the case of *willful* spoliation is the spoliator's mental culpability itself evidence of the relevance of the documents destroyed.[52]

On the one hand, I found in *Zubulake I* and *Zubulake III* that the e-mails contained on UBS's backup tapes were, by-and-large, relevant in the sense that they bore on the issues in the litigation.[53] On the other hand, *Zubulake III* specifically held that "nowhere (in the sixty-eight e-mails produced to the Court) is there evidence that Chapin's dislike of Zubulake related to her gender."[54] And those sixty-eight e-mails, it should be emphasized, were the ones selected by Zubulake as being the *most* relevant among all those produced in UBS's sample restoration. There is no reason to believe that the lost e-mails would be any more likely to support her claims.

Furthermore, the likelihood of obtaining relevant information from the six-plus lost backup tapes at issue here is even lower than for the remainder of the tapes, because the majority of the six-plus tapes cover the time prior to the filing of Zubulake's EEOC charge. The tape that is most likely to contain relevant e-mails is Tong's August 2001 tape—the tape for the very month that Zubulake filed her EEOC charges. But the majority of the e-mails on that tape are preserved on the September 2001 tape. Thus, there is no reason to believe that peculiarly unfavorable evidence resides solely on that missing tape. Accordingly, Zubulake has not sufficiently demonstrated that the lost tapes contained relevant information.[55]

48. *See Byrnie*, 243 F.3d at 107–12.

49. *See* Fed.R.Evid. 401; Fed.R.Civ.P. 26(b)(1).

50. *See Residential Funding*, 306 F.3d at 108–09 ("Although we have stated that, to obtain an adverse inference instruction, a party must establish that the unavailable evidence is 'relevant' to its claims or defenses, our cases make clear that 'relevant' in this context means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence. Rather, the party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that 'the destroyed or unavailable evidence would have been of the nature alleged by the party affected by its destruction.' ") (citations, footnote, and alterations omitted).

51. *Turner*, 142 F.R.D. at 77 (citing *Stanojev v. Ebasco Services, Inc.*, 643 F.2d 914, 924 n. 7 (2d Cir.1981)).

52. *See Residential Funding*, 306 F.3d at 109.

53. *See Zubulake I*, 217 F.R.D. at 316–17; *Zubulake III*, 216 F.R.D. at 284–87.

54. 216 F.R.D. at 286.

55. *See generally Turner*, 142 F.R.D. at 77 ("Where, as here, there is no extrinsic evidence whatever tending to show that the destroyed evidence would have been unfavorable to the spoliator, no adverse inference is appropriate.");

#### d. Summary

In sum, although UBS had a duty to preserve all of the backup tapes at issue, and destroyed them with the requisite culpability, Zubulake cannot demonstrate that the lost evidence would have supported her claims. Under the circumstances, it would be inappropriate to give an adverse inference instruction to the jury.

#### 3. UBS Must Pay the Costs of Additional Depositions

■ Even though an adverse inference instruction is not warranted, there is no question that e-mails that UBS should have produced to Zubulake were destroyed by UBS. That being so, UBS must bear Zubulake's costs for re-deposing certain witnesses for the limited purpose of inquiring into issues raised by the destruction of evidence and any newly discovered e-mails. In particular, UBS is ordered to pay the costs of re-deposing Chapin, Hardisty, Tong, and Josh Varsano (a human resources employee in charge of the Asian Equities Sales Desk and known to have been in contact with Tong during August 2001).[56]

### IV. CONCLUSION

For the reasons set forth above, Zubulake's motions for an adverse inference instruction and for reconsideration of the Court's July 24, 2003, Order are denied. Her motion seeking costs for additional depositions is granted.

SO ORDERED.

---

*Concord Boat Corp. v. Brunswick Corp.,* 1997 WL 33352759, at *7 (E.D.Ark.1997) ("It would simply be inappropriate to give an adverse inference instruction based upon speculation that deleted e-mails would be unfavorable to Defendant's case.").

**56.** *See* 9/26/03 Tr. at 26 (statement of James Batson, seeking to re-depose only these four employees).