**MRT, INC. d/b/a International Magnetic Technologies, Inc., The Rose Group, Inc., Hubert Flamant, and Elisabeth Flamant, Appellants,**

v.

**Roger VOUNCKX and Inter–University Micro–Electronics Center, Appellees.**

No. 05–08–00193–CV.

Court of Appeals of Texas, Dallas.

Oct. 30, 2009.

502

Ophelia F. Camina, Shawn L. Raymond, Susman Godfrey, L.L.P., Brett D. Kutnick, Jeffrey S. Levinger, Hankinson Levinger LLP, Dallas, TX, for Appellants.

William Ross Forbes, Jr., Mark T. Josephs, William D. Ellerman, Mark T. Hollan, Jackson Walker, L.L.P., P. Michael Jung, Strasburger & Price, L.L.P., Dallas, TX, James E. Davis, Sloan Rawlins Davis, Ferguson Davis, P.C., Plano, TX, for Appellees.

Before Justices MORRIS, RICHTER, and LANG–MIERS.

**OPINION**

Opinion By Justice MORRIS.

This appeal follows a jury trial. MRT, Inc. d/b/a International Magnetic Technologies, Inc., The Rose Group, Inc., Hubert Flamant, and Elisabeth Flamant brought suit against Roger Vounckx and Inter–University Micro–Electronics Center. Appellants sought damages for appellees' alleged misrepresentations and failures to disclose information that appellants claim induced them to loan and guarantee funds for the purposes of marketing a new micro-electronics technology appellees developed collaboratively. In accordance with the jury's verdict, the trial court rendered a take-nothing judgment in favor of appellees. In five issues, appellants seek reversal of the trial court's judgment. They contend that they are entitled to a new trial because of certain errors and omissions in the jury charge, the trial court's erroneous denial of their pre-trial motion for continuance, and the trial court's failure to grant their motion for new trial based on newly discovered evidence. Concluding appellants' arguments lack merit, we affirm the trial court's judgment.

**I.**

The parties' dispute arose out of their attempts from 1996 through 2001 to market "PhotonLink," a method of communication between computer chips that is purportedly faster and more efficient than traditional computer chip communication. In 1995, MRT's chief technical officer and vice president, Ivan Darius, first informed Hubert Flamant about the PhotonLink technology.[1] Hubert Flamant was the president of MRT and its parent company, the Rose Group. Rose Rose, Ltd. was the parent company of the Rose Group.[2]

Darius learned about PhotonLink through Roger Vounckx, a professor and head of a research laboratory at Vrije Universiteit Brussel (VUB), a university in

---

1. PhotonLink emerged from what was known previously as optical thyristor technology.

2. Although Rose Rose, Ltd. is not a party in the lawsuit, we refer to it for purposes of describing how the funding for PhotonLink was accomplished.

Brussels, Belgium. VUB collaboratively developed the PhotonLink technology with IMEC, a non-profit institute created by the Flemish government in Belgium to research and develop micro and nano electronics technologies with certain universities and private businesses.

Initially, Vounckx and Darius discussed with Flamant the possibility of a joint venture between MRT and IMEC where MRT would contribute $1.3 million to develop a demonstrator for the PhotonLink technology.[3] MRT decided not to enter into the joint venture after a March 1996 meeting with Darius, Vounckx, MRT's general counsel, and two IMEC representatives. One week after the meeting, however, Flamant formed Rose Research to market the PhotonLink technology.[4] Darius became the president of Rose Research, and Vounckx was named its chief technical officer. MRT and Rose Group provided funding for Rose Research. According to Flamant, the funds his companies loaned to Rose Research were obtained from interest bearing loans provided by Rose Rose, Ltd.

In October 1998, Rose Research entered into a non-exclusive licensing agreement with IMEC to market PhotonLink. By 1999, Flamant asserts that MRT and Rose Group had advanced $1.8 million to Rose Research and Rose Rose, Ltd. refused to loan any more funds to MRT or Rose Group unless Flamant and his wife Elisabeth Flamant personally guaranteed all past and future loans. Flamant asserts that, based on his communications with Darius and Vounckx at the time, he and his wife signed a personal guarantee on September 14, 1999 for all past and future sums loaned from Rose Rose, Ltd. Flamant asserts he continued to fund Rose

Research with loans from Rose Rose, Ltd. based on promising reports and information about impending deals he received from Darius and appellees. In March 2001, after these deals failed to materialize and Rose Research failed to generate any significant revenue, Flamant stopped authorizing loans to Rose Research. On June 8, 2001, Darius and Vounckx resigned from Rose Research. According to Flamant, Rose Research's inability to repay the funds loaned to it by MRT and the Rose Group left him and his wife obligated to repay the loans from Rose Rose, Ltd. pursuant to their personal guarantees.

Appellants filed this lawsuit for fraud, negligent misrepresentation, and breach of fiduciary duty asserting they owe millions of dollars to Rose Rose, Ltd. based on appellees' allegedly false representations and omissions about the capabilities and market-readiness of PhotonLink. Appellants also claim they were misled into believing Vounckx's laboratory was part of, or a division of, IMEC. After a thirteen-day trial, the jury found in favor of appellees on all claims. The trial court rendered a take-nothing judgment against appellants in accordance with the jury verdict. This appeal followed.

## II.

■ We first address appellants' complaints about the trial court's jury charge. Appellants contend the trial court erred in refusing to submit their requested instruction and question about IMEC's "ratification of Vounckx's conduct with respect to his dealings with appellants about PhotonLink or commercializing IMEC technologies." Appellants also complain about the

---

3. A demonstrator is device through which the technology is exhibited.

4. Rose Research was initially formed as a Texas partnership but later changed to a limited liability company.

trial court's damages questions.[5] A trial court has wide discretion in submitting instructions and jury questions. *European Crossroads' Shopping Ctr., Ltd. v. Criswell,* 910 S.W.2d 45, 54 (Tex.App.-Dallas 1995, writ denied). We review the trial court's submission of instructions and jury questions for an abuse of discretion. *Id.* To obtain reversal of a judgment based on jury charge error, appellants must show the claimed errors probably caused rendition of an improper judgment. *See* TEX. R.APP. P. 44.1(a)(1). Asserted charge error is harmless if the jury's answers to other questions render the challenged question or instruction error immaterial. *See City of Brownsville v. Alvarado,* 897 S.W.2d 750, 752 (Tex.1995). After reviewing the record before us, we conclude appellants have failed to demonstrate any reversible error in connection with their jury charge complaints.

■■■■ The jury found specifically that neither appellee committed fraud or breached a fiduciary duty with respect to any of the appellants.[6] Based on these unchallenged jury findings, the charge errors appellants claim occurred are necessarily harmless as they relate to their fraud and breach of fiduciary duty claims. *See id.* With respect to appellants' negligent misrepresentation claim, the jury found that both Vounckx and IMEC negligently misrepresented Vounckx's relationship to IMEC based on Vounckx's use of and IMEC's "allowing indiscriminate use of" Vounckx's email signature block containing a VUB–IMEC designation. The jury further found, however, that appellants suffered zero damages as a result of Vounckx's and IMEC's negligent misrepresentation. Accordingly, appellants cannot show that the absence of the ratification instruction and question probably caused the rendition of an improper verdict with respect to their negligent misrepresentation claim.[7] *See* TEX.R.APP. P. 44.1. We thus turn to appellants' complaints about the trial court's damages questions as they relate to their negligent misrepresentation claims.

The damages questions required the jury to identify, with respect to each defendant, the date of each negligent misrepresentation and the amount of damages suffered by each plaintiff as a result of each negligent misrepresentation. As noted above, the jury found appellants suffered zero damages as a result of the negligent misrepresentations they attributed to IMEC and Vounckx. On appeal, appellants assert the jury was confused by the damages questions. They argue that instead of providing a specific date for each tort event where requested, the jury's answers often referred to certain trial exhibits or included indecipherable dates. Appellants also argue the questions were improper because the damages to each appellant were indivisible.[8] We are unper-

5. .We address appellants' complaint about the trial court's failure to include a spoliation instruction later with the issues related to discovery.

6. The trial court submitted broad-form questions on appellants' fraud and negligent misrepresentation claims with respect to each appellant and each appellee. The trial court also submitted a broad-form question on appellants' breach of fiduciary duty claims with respect to Vounckx and each appellant. No breach of fiduciary duty questions were submitted with respect to IMEC, however.

7. In fact, it appears the jury's negligent misrepresentation findings against both IMEC and Vounckx were based solely on Vounckx's email signature block, which is yet another reason the ratification issue was irrelevant and cannot result in reversible error.

8. Additionally, appellants complain the damages questions were improper because the defendants engaged in a "string along scheme

suaded by appellants' arguments for the following reasons.

■ First, our review of the findings reveals that the jury was not confused by the trial court's damages questions. In fact, the jury made several discrete damage assessments against one co-defendant. Moreover, appellants have not challenged the legal or factual sufficiency of the jury's zero-damages award on appellants' negligent misrepresentation claims, and our review of the record indicates that the jury's zero-damage award is amply supported by the evidence. Finally, given the claims and defenses asserted, the complex facts presented at trial, and the multiple parties involved in this lawsuit, we cannot say the trial court abused its discretion in submitting the damages questions, linked to specific negligent misrepresentations, in this way. *See Criswell,* 910 S.W.2d at 54. We resolve appellants' fifth issue against them.

### III.

At the heart of appellants' remaining four issues is a discovery dispute involving IMEC's computer backup tapes. IMEC had a backup system of magnetic tapes for information retrieval in the case of database corruption or disaster recovery. According to IMEC, backup data was kept to enable restoration of complete servers and not the individual user data contained on those servers. The tapes were not stored for the purposes of archival preservation.

In their several requests for production, appellants requested certain "documents," which was defined to include "any computer-generated, computer-stored, or electronically-stored matter ... relevant to the subject matter of this lawsuit" and "responsive data or information that exists

in electronic or magnetic form." Appellants did not request the production of or refer specifically to backup tapes in their requests for production. Before appellants' requests for production, the parties did not exchange information about their electronic systems or storage methodologies. IMEC responded to appellants' various production requests stating that it would produce, had produced, or did not possess documents responsive to the requests. On May 19, 2006, appellants' counsel wrote to IMEC's attorney requesting ten categories of documents IMEC did not produce and seeking confirmation that IMEC had searched for emails between IMEC and certain entities and persons. IMEC's counsel responded that IMEC was conducting a diligent search for responsive documents and would produce any additional responsive documents. Appellants then filed a motion on June 14, 2006 to compel production of those documents listed in the May 19 letter. The trial court ordered IMEC to produce any additional responsive documents or to advise that no additional documents could be located by July 15, 2006. IMEC produced another six pages of documents pursuant to the trial court's order.

At depositions occurring from August 28 to September 3, 2006, appellants' counsel learned of IMEC's computer backup tapes. Appellants' counsel sent IMEC's attorney an email on September 7, 2006 requesting additional documents and that IMEC search its backup tapes as well as other specified repositories. The September 7 email also requested IMEC to notify counsel whether it would agree to search the backup tapes in addition to other repositories. IMEC's counsel responded that he had forwarded the email request to IMEC

---

of fraud" and it was not possible for the jury to identify the date of each nondisclosure. Because these arguments apply only to appel-

lants' fraud claims, which the jury clearly rejected, we do not address them.

and would supplement its production responses to the extent any additional documents were located. Appellants filed a second motion to compel on November 20, 2006 requesting, among other things, that "IMEC be ordered to search its back ups for any of the information ordered." Before the hearing on appellants' motion, however, the trial court signed an amended docket control order setting a November 30, 2006 discovery deadline and a special setting trial date of February 26, 2007 [9].

On December 19, 2006, the trial court ordered IMEC to submit an affidavit detailing its search efforts. IMEC provided an affidavit dated December 22, 2006 stating the following with respect to its search of backup tapes: "... I was told by IMEC's IT manager that the only reasonable way the tapes could be searched would be through a particular name on a particular date" and "it was not reasonably possible to retrieve information relating to a specified individual over a certain period of time." Although the trial date was only two months away and the affidavit confirmed that IMEC had not searched its backup tapes, appellants waited until January 22, 2007 to file another motion to compel IMEC to search its backup tapes. IMEC objected to the motion on multiple grounds. IMEC also indicated that all backup tapes existing before 2000 had been destroyed.[10] After a hearing, the trial court ordered IMEC to produce by February 23, 2007 certain documents described in appellants' counsel's May 19 letter "which are contained on IMEC's back-

up tapes." Appellants then filed a motion seeking a spoliation instruction based on the destruction of the pre–2000 backup tapes. Two days later, IMEC filed an emergency motion for reconsideration of the trial court's order to compel production of documents on its backup tapes, asserting that despite its efforts, it could not comply with the February 23 deadline and there was no evidence any relevant documents could be retrieved from the backup tapes. The trial court heard both motions on the Friday before the scheduled trial date of Monday, February 26, 2007.

At the hearing, IMEC detailed their efforts to comply with the court's order. An affidavit from the head of IMEC's information technology department stated that of the 103 backup tapes in IMEC's possession from the relevant time period it had imported nine of the tapes, a process that takes about six to seven hours per tape.[11] The affidavit also set forth the difficulties in restoring and searching the tapes. Of the imported tapes, one contained mail server data from July 2000, and the remaining tapes contained file server data from July 2001. As of the date of the hearing, IMEC had been able to restore and search only one of the nine imported tapes.

The trial court asked appellants' counsel how long it would take for her to go through the existing 103 backup tapes. Appellant's counsel indicated that she would like two days to determine whether the ten backup tapes IMEC attempted to restore were accessible and contained rele-

---

**9.** The amended docket control order was signed on December 12, 2006.

**10.** IMEC noted that in 2000 it began using a different type of magnetic tape. As a result, the new backup hardware could not handle the older tapes. In 2003, IMEC began using a new software to retrieve information on its backup tapes but it was incompatible with the pre–2000 tapes. Lacking the ability to read the pre–2000 backup tapes they were storing, IMEC destroyed them.

**11.** IMEC indicated its attempt to import a tenth tape but a tape error prevented importation.

vant documents. The trial court offered to take the case off of the trial docket and reset the case for Tuesday, depending on what appellants found on the ten tapes and whether they needed to examine all of the backup tapes.[12] Appellants indicated they did not want to lose their trial setting without first determining whether the tapes could be restored.

Ultimately, the trial court ordered IMEC to deliver to appellants by Sunday, February 25, the ten tapes it had attempted to restore and scheduled a hearing for Tuesday to determine whether the trial would begin on Wednesday. The trial court indicated it would consider a continuance request by appellants based on what they found in the backup tapes. On Tuesday, appellants moved for a three-week continuance and the production of thirty-eight additional backup tapes. Appellants stated they had unlocked the ten backup tapes in their possession and anticipated the restoration process would take one week to complete at which point the tapes could be searched. At the time of the hearing, appellants had no knowledge of the specific documents on the backup tapes or even whether they contained documents responsive to appellants' requests. The trial court denied the motion and the trial began the next day.

## IV.

■■ We begin our discussion of the discovery issues with appellants' underlying contention that they are entitled to a new trial because IMEC failed to comply with its discovery obligations and concealed facts relating to the search and production of documents from its backup tapes until the eve of trial. Appellants contend IMEC's misrepresentations that it

had diligently searched for and produced all responsive documents, combined with its failure to assert any objection under rule 196.4 of the Texas Rules of Civil Procedure, required IMEC to search and produce responsive documents contained on its backup tapes. IMEC contends it was under no obligation to object because appellants never made a specific request for the backup tapes or documents on the backup tapes as required by rule 196.4. The Texas Supreme Court recently summarized the appropriate procedures under rule 196.4 as it relates to electronic discovery. *See In re Weekley Homes, L.P.*, 295 S.W.3d 309 (Tex.2009). As noted in *Weekley*, the specificity requirement of rule 196.4 is designed to ensure requests for electronic information are clearly understood and disputes avoided. *Id.* at 313–15. Acknowledging cooperation and agreements between parties and their attorneys as a fundamental tenet of our discovery rules, the *Weekley* court stated that before tendering requests for electronic information, parties should share relevant information concerning electronic systems and storage methodologies so that agreements regarding protocols may be reached and trial courts have the necessary information to rule on discovery issues when the parties cannot agree. *Id.* at 321–22. As noted above, the parties here did not exchange information about their electronic systems and, not surprisingly, the parties had different expectations of what the various requests for electronic discovery entailed, resulting in much confusion and multiple discovery motions before the trial court. Because appellants did not initially specifically request production of the backup tapes or documents that resided only on IMEC's backup tapes, we conclude

---

**12.** The trial court indicated that although appellants would lose the Monday trial setting, he could "give it back to [appellants] relatively quickly, in other words, [appellants] may lose a month."

IMEC had no duty to object in its responses that the backup tapes or the documents contained on them were not reasonably available. *See id.* at 316–17. Moreover, after the trial court ordered IMEC to detail its search efforts in response to appellants' motion to compel, IMEC provided an affidavit indicating that the backup search as requested by appellants was not reasonably possible. Based on the record before us, we do not agree with appellants' initial contention that IMEC defaulted on its discovery obligations or concealed facts relating to its searches until the eve of trial.

■■■■ We next address appellants' complaint that the trial court abused its discretion when it denied their motion for a three-week continuance and motion to compel the production of additional backup tapes. Appellants argue that the trial court's rulings forced them to proceed to trial without all of the discovery and evidence to which they were entitled and without a meaningful opportunity to review the data from the ten backup tapes. We review the trial court's rulings under an abuse of discretion standard. *See BMC Software Belg., N.V. v. Marchand,* 83 S.W.3d 789, 800 (Tex.2002) (continuance); *Carbonara v. Tex. Stadium Corp.,* 244 S.W.3d 651, 658 (Tex.App.-Dallas 2008, no pet.) (compel discovery). When a movant requests a continuance for additional time to conduct discovery, the following nonexclusive factors should be considered: the length of the time the case has been on file, the materiality and purpose of the discovery sought, and whether the movant exercised due diligence to obtain the discovery sought. *Joe v. Two Thirty Nine Joint Venture,* 145 S.W.3d 150, 161 (Tex. 2004).

Appellant's original petition was filed in May 2003. On June 14, 2006, the parties entered into an agreed docket control order that included a preferential trial setting of January 16, 2007. The docket control order was later amended to include a discovery deadline of November 30, 2006 and a preferential trial setting of February 26, 2007. Although IMEC's December 22 affidavit revealed it had not searched its backup tapes, appellants waited until January 22, 2007 to file a motion to compel IMEC to search the tapes. Moreover, despite IMEC's representations that the search requested by appellants was not reasonably possible and its later assertions that its attempted search did not retrieve any usable data, appellants never requested IMEC to produce the backup tapes. The first time production of the backup tapes was even discussed was at the February 23 hearing, three days before trial was set to begin. At that hearing, it was revealed that IMEC had attempted to search only ten of the backup tapes and that a search of all 103 backup tapes would be impossible before the trial date. The trial court was amenable to resetting the trial date to allow all of the backup tapes to be searched. Appellants did not want to reset the trial at that time, however. In fact, on February 1, just ten days after appellants filed their motion to compel IMEC to search its backup tapes and three weeks before the Friday hearing, appellants strongly opposed IMEC's request for a continuance to conduct further discovery.

Appellants' February 27 motion indicated that it would take one week to complete the restoration of the ten backup tapes and put the data in "native" format. Appellants' counsel indicated that after the data was in native format, it would be searched for relevant documents. At the hearing, appellants could not identify any information on the backup tapes. They did not know whether there were any documents that were responsive to their discovery

requests on the tapes. Nor could they establish any relevant documents retrieved from the tapes would be material to their case. Moreover, a number of witnesses who lived in Belgium were present in Dallas for the February 26, 2007 trial date. Defendant Vounckx, a Belgian resident not involved in the discovery dispute, was also in Dallas and ready to proceed. Based on the record before us, we cannot conclude the trial court abused its discretion in denying appellants' motion for continuance and motion to compel production of additional backup tapes. We resolve appellants' second issue against them.

In their third issue, appellants complain about the trial court's refusal to submit their requested spoliation instruction based on IMEC's destruction of the pre–2000 backup tapes. Spoliation is the deliberate destruction of, failure to produce, or failure to explain the non-production of relevant evidence, which, if proved, may give rise to a presumption that the missing evidence would be unfavorable to the spoliator. *See Wal–Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 721 (Tex. 2003). A trial court's denial of a spoliation instruction is subject to an abuse of discretion standard of review. *Id.* at 723.

As a foundation for the submission of the spoliation instruction, the party requesting the instruction bears the burden of establishing that the alleged spoliator had a duty to preserve the evidence in question. *See id.* at 722. Such a duty arises only when a party knows or

reasonably should know (1) there is a substantial chance that a claim will be filed and (2) the evidence in the party's possession or control will be material and relevant to that claim. *Id.* In the case before us, the first prong of the test is satisfied because it is undisputed that IMEC destroyed the backup tapes in question after appellants filed their lawsuit. To establish that IMEC had a duty to preserve, however, appellants still had to demonstrate there was evidence on the backup tapes that was material and relevant to the case.

Appellants acknowledge that a party is not necessarily required to preserve all backup tapes merely because it is aware of litigation. They argue, however, that IMEC should have retained the pre–2000 backup tapes because "even electronic documents that have been deleted and reside only on backup tapes are discoverable." They further argue IMEC had the duty to preserve the backup tapes because they were the sole source of unique, relevant evidence from the critical years of 1995–1999.[13] The record reveals very little about the backup tapes that were destroyed. We do not know how many tapes were destroyed, the dates the destroyed tapes were originally created, or anything about what the tapes contained or how they were catalogued. All we know is that, at some point in 2003, backup tapes made before 2000 were destroyed. There is also no evidence that any IMEC employee deleted any email or document from IMEC's active online data sources after

---

**13.** Appellants rely on the following to support their contention: (1) Vounckx admitted to regular email communications with IMEC personnel from 1995 through 1998 regarding his ongoing research and a collaborative agreement between IMEC and Rose Research; (2) IMEC's vice president of business development testified he reviewed a series of emails between Vounckx and Wuyts in 1998 with respect to the PhotonLink deal; (3)

IMEC scientist Paul Heremans stated he didn't recall but it was very likely that he communicated via email with his boss and Vounckx about the PhotonLink venture and was "pretty sure" there had been "email conversations" in 1995 and 1996 among IMEC personnel about whether to proceed with the commercialization of the PhotonLink technology.

IMEC became aware of appellants' lawsuit. Because appellants did not meet their burden of demonstrating IMEC knew or should have known the pre–2000 backup tapes contained material and relevant evidence with respect to their claims, they failed to establish that IMEC had a duty to preserve the backup tapes in question.

In reaching our conclusions, we are unpersuaded by appellants' reliance on the *Zubulake* line of cases as the facts here differ greatly from those presented in *Zubulake*. *See Zubulake v. UBS Warburg LLC,* 217 F.R.D. 309 (S.D.N.Y.2003) (*Zubulake 1* ); 220 F.R.D. 212 (S.D.N.Y.2003) (*Zubulake IV* ); 229 F.R.D. 422 (S.D.N.Y. 2004) (*Zubulake V* ). In *Zubulake,* there was evidence that emails to or from key employees were deleted from active, online data sources *after* a litigation hold was in place. *Zubulake IV,* 220 F.R.D. at 215. Consequently, the only source of these deleted emails was on UBS's backup tapes. *Id.* Moreover the backup tapes containing the emails were missing despite a company policy that the backup tapes were to be retained for three years and thus should have been available. *Id.* at 218–19. *Zubulake IV* also indicates that as a general rule, a litigation hold does not apply to backup tapes maintained solely for the purpose of disaster recovery, which may continue to be recycled on the schedule set forth in the company's policy. *Id.* at 218. As noted above, the purpose of IMEC's backup information system was to provide information retrieval in the case of database corruption or disaster recovery and not for the purposes of archival preservation. Also, there is nothing in the record to reflect that at the time the backup tapes were destroyed IMEC was aware that they contained relevant information or emails that had been deleted from IMEC active data sources after the duty to preserve had attached.

Moreover, even after the *Zubulake* court determined that UBS had a duty to preserve all of the backup tapes at issue and destroyed them with the requisite culpability, it rejected Zubulake's first request for such an instruction because she failed to demonstrate that the lost tapes contained relevant information and the deleted emails would have been favorable to her. *Id.* at 221–22. It was not until *Zubulake V,* after Zubulake presented evidence that UBS employees deleted relevant emails that were either lost altogether or recovered from backup tapes and other sources long after her initial document requests, that the trial court granted Zubulake's request for an adverse inference instruction. *Zubulake V,* 229 F.R.D. at 426, 437. Because appellants failed to meet their burden of establishing that IMEC had a duty to preserve the pre–2000 backup tapes or that the destroyed tapes contained relevant information, we conclude the trial court did not abuse its discretion in refusing their request for a spoliation instruction.

■■■ Lastly, we address appellants' complaint that the trial court abused its discretion in denying their motion for new trial based on newly discovered evidence. When a party seeks a new trial based on newly discovered evidence, it must show the trial court that (1) it became aware of the evidence since the trial, (2) the evidence was not discovered earlier because of lack of due diligence, (3) the evidence is not cumulative, and (4) the evidence is so material that it would probably produce a different result if a new trial were granted. *Jackson v. Van Winkle,* 660 S.W.2d 807, 809 (Tex.1983), *overruled on other grounds by Moritz v. Preiss,* 121 S.W.3d 715, 720–21 (Tex.2003). We review a trial court's ruling on a motion for new trial for an abuse of discretion and will indulge every

reasonable presumption in favor of trial court orders refusing new trials. *Id.*

 On December 14, 2007, about eight months after the jury returned its verdict, appellants filed their motion for new trial asserting, among other things, that evidence from the ten backup tapes they received on the eve of trial warranted a new trial. While acknowledging that they began receiving documents from the backup tapes about one week before the trial ended, appellants assert, "The remaining documents were not extracted until well after the trial was over." In connection with their motion for new trial, appellants submitted approximately 630 pages from the backup tapes to the trial court for an in camera review. Appellants did not indicate the date the particular documents were discovered. This is significant because it is clear appellants retrieved some of the documents from the backup tapes during the trial. In fact, three of appellants' trial exhibits actually came from documents retrieved from the backup tapes. Yet these emails, or their substantive equivalent, were also included in the 630 pages appellants offered as newly discovered evidence. In their motion, appellants generally claimed the 630 pages demonstrated "IMEC's and Vounckx's knowledge about problems with the PhotonLink technology, whether it was commercially viable, and whether it could be commercially ready before 2002 or later" and related to "IMEC's relationship with Vounckx and the ETRO lab and how IMEC referred to Vounckx and the ETRO lab."[14] Appellants did not, however, reference or address the significance of any specific documents contained in the 630 pages they claimed warranted a new trial.

After reviewing the documents in question and the manner in which they were presented to the trial court, we cannot conclude the trial court erred in determining that appellants failed to establish one or more of the elements needed for a new trial based on newly discovered evidence. Accordingly, the trial court did not abuse its discretion in denying appellants' motion for new trial on this basis.

We affirm the trial court's judgment.

---

14. Appellants note that at the hearing on their motion for new trial, they provided the trial court with a demonstrative chart referring to specific pages and items within the 630 pages submitted for an in camera review. The chart was not admitted into evidence and is not before us.